Argued and submitted March 21, affirmed May 23, reconsideration denied July 11, petition for review denied July 31, 1990 (310 Or 205)

## PACIFIC INLAND NAVIGATION, INC.,
*Appellant,*

*v.*

## RIEDEL INTERNATIONAL, INC.,
*Respondent.*

(A8805-02890; CA A51296)

792 P2d 443

Craig D. White, Portland, argued the cause and filed the briefs for appellant.

Charles F. Adams, Portland, argued the cause for respondent. With him on the brief were Barnes H. Ellis and Stoel Rives Boley Jones & Grey, Portland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

## RICHARDSON, P. J.

Plaintiff appeals the summary judgment for defendant in this action for breach of a contract whereby plaintiff alleged that defendant agreed to sell barges to it. The contract, according to plaintiff, took the form of a 1986 oral understanding between its employees and Oliphant, one of defendant's managers. Plaintiff contends that the agreement was, in turn, ratified by Arthur Riedel, defendant's president, in a 1987 conversation between Reidel and plaintiff's representatives. Plaintiff agrees that the alleged contract is subject to the Statute of Frauds, ORS 72.2010(1). It argues, however, that a letter to defendant from one of plaintiff's agents, Raz, constitutes a "writing in confirmation" of the contract, sufficient under ORS 72.2010(2) to make the Statute of Frauds defense unavailable to defendant. We disagree and affirm.

ORS 72.2010(2) provides:

"Between merchants, if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) of this section against such party unless written notice of objection to its contents is given within 10 days after it is received."

The letter from Raz to defendant states, as material:

"After tendering the barges to other barge companies, Mr. Oliphant contacted me to see if we were interested. I said that we might be but that we would have to survey them first. I asked him how much Riedel wanted for them. He replied that 12 were for sale and that the price was $5000.00 each. Mr. Oliphant informed me that the barges for sale were what Riedel called the '200 series', that they were located at the Clackamas plant, and that Mr. Mark Latham would show them to us.

"We then went to the site and made contact with Mark Latham for the purpose of inspection and survey. Mr. Latham telephoned Mr. Oliphant to confirm the purpose of our visit. Mr. Oliphant did this, and instructed Mr. Latham as to which barges were for sale. We spent the afternoon making our survey.

"The next day I phoned Mr. Oliphant and informed him that we would take the best six for $30,000.00. * * * I told Mr. Oliphant that we would be in shortly with a check for the six

barges. He said that Mr. Riedel would want to personally close the sale and may require a non-competition clause. I said 'no problem.'

"* * * * *

"After Mr. Riedel returned, we resumed our attempt for an appointment to close the sale. Finally [another agent of plaintiff] went in to see Mr. Oliphant to put down the money for the barges. Mr. Oliphant was accompanied by Mr. Cox, who would not let Mr. Oliphant speak. Mr. Cox said that the barges were not for sale.

"We then wrote to Mr. Dan Bell about the issue, and his reply was that the barges were not and had not been for sale. I had respect for Mr. Bell's word and let the issue drop, believing that Mr. Oliphant had acted without authority.

"* * * * *

"On June 2, [the writer and other representatives of plaintiff] had a meeting with Art Riedel, Dan Bell, and staff to specifically address the surplus barges * * *.

"I told Mr. Riedel that we were still interested in the old barges and asked him point-blank if he had any reservations about selling them to us.

"His answer was an emphatic 'NO PROBLEM, you can buy one of them or all of them. The problem before was that [Oliphant] was trying to sell something that was not for sale.'

"Mr. Riedel then went to fetch one of his favorite cigars, at my request, to seal the understanding. He went on to say that the barges would be coming up for sale soon, and for us to keep in touch.

"In August we again heard through the river community, and our attorney, that the barges were being offered for sale."

The letter recites that plaintiff then attempted unsuccessfully to consummate a purchase. Defendant subsequently refused to sell barges to plaintiff.

The parties dispute, *inter alia,* whether Raz's letter satisfies the requirements of ORS 72.2010(2) for a writing in confirmation of an oral contract. We conclude that it does not, because, by its own terms, it does not describe any underlying oral contract. The first series of discussions between plaintiff's and defendant's representatives culminated in an understanding that further terms had to be resolved with the direct involvement of Riedel. Later, according to the letter, plaintiff

"let the issue drop, believing Mr. Oliphant had acted without authority." No agreement had been reached before the time that plaintiff's representatives met with Riedel. There was nothing for him to ratify. More fundamentally, the letter does not succeed in showing that any contractual consensus, in the form of a ratification or an independent agreement, emerged from the meeting with Riedel. His statements constituted nothing more than an invitation to make an offer for barges that were not yet for sale. Far from confirming an oral contract, the letter itself indicates that there was no contract. In sum, all that the letter described was an abortive transaction on which no minds ever met.

Plaintiff's remaining arguments either do not warrant discussion or, in view of the basis for our disposition, do not have to be reached.

Affirmed.